Affirmed by published opinion. Judge SHEDD wrote the majority opinion, in which Senior Judge HAMILTON joined. Judge THACKER wrote a dissenting opinion.
SHEDD, Circuit Judge:
Convicted of illegal firearm possession, Henry Stephens contends that the district court erroneously denied his pretrial motion to suppress evidence. Caselaw decided after Stephens was indicted tends to establish that the search at issue is unreasonable under the Fourth Amendment, but we are not now concerned with the legality of the search. Rather, we must decide the separate issue of whether the district court correctly declined to apply the exclusionary rule because the search was conducted in “good faith.” Our consideration of this issue requires us to answer “the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.” Herring v. United States, 555 U.S. 135, 145, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (citation and internal punctuation omitted). Because we find that the search was “conducted in objectively reasonable reliance on binding appellate precedent,” Davis v. United States, — U.S. -, 131 S.Ct. 2419, 2423-24, 180 L.Ed.2d 285 (2011), the answer to this question is “yes.” Therefore, the exclusionary rule does not apply, and we affirm Stephens’ conviction.
I
The underlying facts are not disputed. In 2011, federal and state law enforcement officers in the Baltimore area were investigating Stephens for possible drug and firearms crimes. The investigation began as a result of information provided by a registered confidential informant, and it was spearheaded by Officer Paul Geare, who was a 13-year veteran of the Baltimore Police Department. Officer Geare was also deputized as an ATF agent and assigned to a “High Intensity Drug Trafficking Area” (“HIDTA”) task force unit, which was “a hybrid unit of federal agents as well as city police officers” operating pursuant to Baltimore City and HIDTA guidelines. J.A. 405. The HIDTA joint task force is “organized to conduct investigations into drug and gun violations of both federal and state law, and its investigations indeed [lead] to both federal and state prosecutions, determined on the basis of the facts uncovered.” United States v. Claridy, 601 F.3d 276, 283 (4th Cir.), cert. denied, — U.S. -, 131 S.Ct. 259, 178 L.Ed.2d 172 (2010) (emphasis in original).
On May 13, 2011, Officer Geare — acting without a warrant — installed a battery-powered Global-Positioning-System device (“GPS”) under the rear bumper of Stephens’ vehicle, which was parked in a public lot in Parkville, Maryland.[1] Officer Geare had information that Stephens was a convicted felon, that he would be working security at a nightclub known as “Club Unite” on the evening of May 16, and that *330 he usually carried a firearm when he worked there. With this knowledge, Officer Geare — in conjunction with other officers — implemented a plan to detain Stephens and search him on May 16 at Club Unite.
During the evening of May 16, Officer Geare used the GPS to locate Stephens’ vehicle at an area school. Officer Geare and another city police officer (Sergeant Johnson) then observed and followed Stephens as he drove the vehicle to his residence. Before Stephens left the residence to drive to Club Unite, Officer Geare and Sergeant Johnson saw Stephens, who was standing outside his vehicle, reach around to the back of his waistband. They interpreted this movement as being a check for a weapon. Based on this and other information they had previously obtained, the officers “had at least reasonable suspicion, if not probable cause, that [Stephens] was armed and was on his way to work at Club Unite.” J.A.520.
When Stephens drove away from his residence, Officer Geare alerted other officers who had been briefed on the plan to go to Club Unite. Using visual observation and a portable laptop computer to monitor the GPS, Officer Geare and Sergeant Johnson followed Stephens’ vehicle as he drove on public roads to Club Unite. Upon Stephens’ arrival at Club Unite, the officers who had been alerted approached him and conducted a patdown, which revealed an empty holster in the middle of his back. Within a matter of minutes, a Baltimore city police officer arrived and conducted a canine inspection of the vehicle exterior. After the canine alerted, the officers searched the vehicle and found (among other things) a loaded pistol. The officers then arrested Stephens and charged him with one or more state-law crimes. Stephens remained in state custody for approximately three months, until a federal grand jury indicted him for illegal firearm possession by a convicted felon. See 18 U.S.C. § 922(g)(1). After the federal indictment, the state charges were dismissed. See Presentence Report, No. JKB-11-0447, at 1 (D.Md.).[2]
While this case was pending below, the Supreme Court held in United States v. Jones, — U.S. -, 132 S.Ct. 945, 949, 181 L.Ed.2d 911 (2012), that the government’s “installation of a GPS device on a target’s vehicle, and its use of that device to monitor the vehicle’s movements, constitutes a ‘search’ ” within the meaning of the Fourth Amendment. Because the officers in Jones did not have a valid warrant authorizing the GPS usage, the search— i.e., GPS usage — violated the Fourth Amendment. The Court did not, however, rule that all warrantless GPS searches violate the Fourth Amendment; instead, the Court expressly declined to decide whether reasonable suspicion or probable cause may justify warrantless GPS attachment to vehicles, and that remains an open question. Id. at 954.
Based on Jones, Stephens moved to suppress the firearm and other evidence seized on May 16. Following a hearing, the district court denied the motion. The court concluded that in light of Jones, Officer Geare’s warrantless use of the GPS on Stephens’ vehicle was an unconstitutional search that led to the seizure of the challenged evidence. However, the court held that the exclusionary rule does not apply because Officer Geare used the GPS in good faith. Thereafter, Stephens entered a conditional guilty plea, reserving the *331 right to appeal the suppression order. See Fed.R.Crim.P. 11(a)(2).
II
In May 2011, at the time of Stephens’ arrest and before Jones was decided, it was not uncommon for law enforcement officers in Maryland to attach tracking devices to vehicles without a warrant. See J.A. 364. Indeed, caselaw in our circuit shows that officers in Maryland had been doing so since at least 1976. See United States v. Woodward, 546 F.2d 576 (4th Cir.1976) (declining to address the defendant’s argument that the warrantless attachment of a “beeper” to his truck was an illegal search under the Fourth Amendment). Before Officer Geare attached the GPS to Stephens’ vehicle, he had attached a GPS to other vehicles in public areas without a warrant, and it was his understanding that a warrant was needed only when (unlike here) the GPS was wired into the vehicle’s battery system. See J.A. 364-65. Consistent with Officer Geare’s understanding, the district judge — who had been a United States Magistrate Judge in Maryland for 12 years before being elevated to the district court bench — observed that had Officer Geare applied for a federal warrant to attach a GPS to Stephens’ vehicle, it was “quite likely” that “the magistrate judge would have said ... you don’t need a warrant for that.” J.A. 454. As we explain below, Officer Geare’s and the district judge’s understanding of the state of the law as it existed in 2011 is understandable.
The Fourth Amendment provides in relevant part that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.” The “threshold question” in every Fourth Amendment case is whether a search or seizure occurred, and “not every observation made by a law enforcement officer — even if consciously intended to disclose evidence of criminal activity — constitutes a search within the meaning of the Fourth Amendment.” United States v. Taylor, 90 F.3d 903, 908 (4th Cir.1996). Rather, a search occurs for constitutional purposes only “when an expectation of privacy that society is prepared to consider reasonable is infringed,” United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), and “[o]ffieial conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment,” Illinois v. Caballes, 543 U.S. 405, 408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (citation and internal punctuation omitted). Under this principle, “[w]hat a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection.” Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507,19 L.Ed.2d 576 (1967).
It was well-established by 2011 that “one’s expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one’s residence.” United States v. Martinez-Fuerte, 428 U.S. 543, 561, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). In accord with this principle, we recognized in United States v. George, 971 F.2d 1113, 1119 (4th Cir.1992), that “there can be no reasonable expectation of privacy in a vehicle’s exterior.” Moreover, we observed in United States v. Gastiaburo, 16 F.3d 582, 586 (4th Cir.1994), that “it may be reasonable and therefore constitutional to search a movable vehicle without a warrant, even though it would be unreasonable and unconstitutional to conduct a similar search of a home, store, or other fixed piece of property.” Further, we noted in United States v. Beilina, 665 F.2d 1335, 1340 (4th Cir.1981), that “this rule of diminished ex *332 pectation of privacy is particularly appropriate when the automobile is located in the street or in a public area.”
Although neither the Supreme Court nor this Court had expressly approved or disapproved of warrantless GPS usage in 2011, the Supreme Court had rejected a Fourth Amendment challenge to law enforcement officers’ use of a beeper, which is the technological forerunner to the GPS. In United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), officers had placed a beeper in a container that was later filled with chloroform, which they suspected was being used to make illegal drugs. After the chloroform was purchased, one suspect (Petschen) placed the container in his vehicle, and the officers followed the container by using both visual surveillance of the vehicle and a monitor that received signals from the beeper. The officers eventually obtained a search warrant for Knotts’ cabin and premises, which is where the container was delivered, and they discovered a drug-making laboratory. Following his arrest, Knotts unsuccessfully moved to suppress evidence on Fourth Amendment grounds because of the beeper use, and he was convicted on a drug conspiracy charge.
The Court upheld the denial of the suppression motion, holding that the use of the beeper was not a search under the Fourth Amendment. Id. at 285, 103 S.Ct. 1081. Noting the diminished expectation of privacy in automobiles, the Court explained that “[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.” Id. at 281, 103 S.Ct. 1081. Thus, “[w]hen Petschen travelled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was travel-ling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination....” Id. at 281-82, 103 S.Ct. 1081. Importantly, the Court specifically rejected Knotts’ argument concerning the beeper:
Visual surveillance from public places along Petschen’s route or adjoining Knotts’ premises would have sufficed to reveal all of these facts to the police. The fact that the officers in this case relied not only on visual surveillance, but on the use of the beeper to signal the presence of Petschen’s automobile to the police receiver, does not alter the situation. Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and-technology afforded them in this case.
Id. at 282, 103 S.Ct. 1081. Although the Court left open the possibility that a different rule may apply in a future case for “dragnet-type law enforcement practices,” it observed that to the extent that Knotts’ argument was “simply that scientific devices such as the beeper enabled the police to be more effective in detecting crime, it simply has no constitutional foundation.” Id. at 284,103 S.Ct. 1081.[3]
*333 Knotts involved the use of a beeper, but it “was widely and reasonably understood to stand for the proposition that the Fourth Amendment simply was not implicated by electronic surveillance of public automotive movements.” United States v. Sparks, 711 F.3d 58, 67 (1st Cir.2013); see also United States v. Aguiar, 737 F.3d 251, 261 (2d Cir.2013) (“Knotts stood for the proposition that the warrantless use of a tracking device to monitor the movements of a vehicle on public roads did not violate the Fourth Amendment”). Although we had not been presented with the issue directly, we interpreted Knotts, in conjunction with the subsequent case of United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984),[4] as standing for the proposition that “monitoring of a beeper falls within the ambit of the Fourth Amendment when it reveals a critical fact about the interior of premises that could not have been obtained through visual surveillance.” United States v. Jones, 31 F.3d 1304, 1310 (4th Cir.1994) (citation and internal punctuation omitted).
Moreover, Knotts was considered to be the “foundational Supreme Court precedent for GPS-related cases.” United States v. Cuevas-Perez, 640 F.3d 272, 273 (7th Cir.2011). Based on Knotts, several federal appellate courts held before 2011 that the warrantless use of a GPS to track the location of a vehicle did not necessarily violate the Fourth Amendment. See, e.g., United States v. Pineda-Moreno, 591 F.3d 1212, 1215-17 (9th Cir.2010) (GPS installation and use is not a search);[5] United States v. Marquez, 605 F.3d 604, 610 (8th Cir.2010) (GPS installation and use requires only reasonable suspicion); United States v. Garcia, 474 F.3d 994, 997-98 (7th Cir.2007) (GPS installation and use is not a search); but see United States v. Maynard, 615 F.3d 544, 555-60 (D.C.Cir.2010) (prolonged GPS surveillance is a search).[6] Two months after Stephens was arrested, the Fifth Circuit relied on Knotts and its own prior precedent relating to beeper usage to hold that the warrantless placement and usage of a GPS on a vehicle was not a search under the Fourth Amendment. See United States v. Hernandez, 647 F.3d 216, 220-21 (5th Cir.2011). Thus, a significant body of federal law existed nationally in 2011 to support the view that warrantless attachment of a GPS to a vehicle was not a search within the meaning of the Fourth Amendment or was permissible when officers possessed reasonable suspicion that criminal activity was afoot.[7]
*334 Consistent with this body of federal law, the Court of Special Appeals of Maryland had expressly found in 2008 that warrant-less GPS usage was permissible under the Fourth Amendment. In Stone v. State, 178 Md.App. 428, 941 A.2d 1238 (2008), Maryland law enforcement officers who were investigating Stone for burglary attached a GPS to his truck, and they later used information from the GPS to locate and arrest him. During a pretrial suppression hearing, Stone’s counsel sought to cross-examine one of the officers concerning the GPS in order to establish that the GPS usage violated his Fourth Amendment rights. The trial court disallowed the cross-examination, and Stone appealed.
Relying primarily on Knotts, the Court of Special Appeals affirmed the trial court, concluding that it “did not abuse its discretion in cutting short the appellant’s cross-examination about ... the GPS tracking device because it was unlikely that cross-examination on those points would have produced any relevant evidence.” Id. at 1249. The court noted that the GPS was “simply the next generation of tracking science and technology from the radio transmitter ‘beeper’ in Knotts, to which the Knotts Fourth Amendment analysis directly applies,” and it stated that “the use of the GPS device could not be a Fourth Amendment violation, and hence further inquiry about it [on cross-examination] would not have led to relevant information.” Id. at 1250. Explaining this decision, the court observed:
[Stone] did not have a reasonable expectation of privacy in his location in the public, and, more specifically, in a vehicle riding on public roads, and therefore evidence about the use of the GPS device ... merely to locate him in public, which just as well could have been done by human-visualization — though less efficiently — was not relevant to [his] Fourth Amendment-based suppression motion.
Id. at 1250-51.
Recently, in Kelly v. State, 436 Md. 406, 82 A.3d 205 (2013), the Maryland Court of Appeals resolved any doubt about the state of the law that existed in Maryland in 2011. The court held that “before Jones, binding appellate precedent in Maryland, namely Knotts, authorized the GPS tracking of a vehicle on public roads.” Id. at 216. The court explained that before Jones, it would have applied Knotts like the Court of Special Appeals had done in Stone, “to resolve the question of the constitutionality of GPS tracking of a vehicle on public roads.” Id. For this reason, the court held that “just as the Court of Special Appeals applied Knotts, pr e-Jones, when considering the relevance of testimony on the subject of GPS tracking of a vehicle on public streets in Stone, so too could police officers reasonably rely on Knotts, pr e-Jones, in affixing a GPS tracking device to the vehicle of a person under their investigation for the purpose of conducting surveillance.” Id.
Ill
For purposes of this appeal, we accept the district court’s ruling that Officer Geare’s use of the GPS to locate and follow Stephens in May 2011 was an unreasonable search under the Fourth Amendment that led directly to the seizure of the evidence from Stephens’ vehicle and his arrest. Starting from this premise, we must decide the separate question of whether the exclusionary rule renders the evidence inadmissible.[8] Because the facts *335 are not disputed, this question involves a pure legal conclusion, and we review the district court’s ruling de novo. See United States v. DeQuasie, 373 F.3d 509, 520 (4th Cir.2004).
A.
The Supreme Court created the exclusionary rule “to safeguard against future violations of Fourth Amendment rights through the rule’s general deterrent effect.” Arizona v. Evans, 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). The exclusionary rule “generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant’s Fourth Amendment rights,” Pennsylvania Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 359, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998), but the “sole purpose” of the rule “is to deter future Fourth Amendment violations,” Davis v. United States, — U.S. -, 131 S.Ct. 2419, 2426,180 L.Ed.2d 285 (2011), and its application “properly has been restricted to those situations in which its remedial purpose is effectively advanced,” Illinois v. Krull, 480 U.S. 340, 347, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). As the Court has recently made clear, the exclusionary rule is not a “strict liability regime,” Davis, 131 S.Ct. at 2429, and exclusion of evidence has “always been [the] last resort, not [the] first impulse.” Hudson v. Michigan, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006).
“Exclusion exacts a heavy toll on both the judicial system and society at large,” because it “almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence,” and “its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment.” Davis, 131 S.Ct. at 2427. In order for the exclusionary rule “to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.” Id. “Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system.” Id. at 2428 (citation and internal punctuation omitted). Therefore, the exclusionary rule is applicable “[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, [and] the deterrent value of exclusion is strong and tends to outweigh the resulting costs.” Id. at 2427 (citations and internal punctuation omitted).
However, “when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.” Id. at 2427-28 (citations and internal punctuation). The “pertinent analysis of deterrence and culpability is objective, not an inquiry into the subjective awareness of arresting officers,” and the “good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.” Herring, 555 U.S. at 145, 129 S.Ct. 695 (internal punctuation omitted).[9]
*336 Conducting the good-faith inquiry, the Supreme Court has found the exclusionary rule to be inapplicable in a variety of circumstances involving Fourth Amendment violations. See, e.g., United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (where police conducted a search in reasonable reliance on a warrant that was later held invalid); Krull (where police conducted a search in reasonable reliance on subsequently invalidated state statutes); Evans (where police reasonably relied on erroneous information in a database maintained by judicial employees); Herring (where police reasonably relied on erroneous information in a database maintained by police employees). Our precedent makes it clear that application of the good-faith inquiry is not limited to the specific circumstances addressed by the Supreme Court. For example, in United States v. Davis, 690 F.3d 226, 251-57 (4th Cir.2012), cert. denied, — U.S. -, 134 S.Ct. 52, 187 L.Ed.2d 47 (2013), we held that the exclusionary rule did not apply where officers engaged in an unconstitutional search by extracting and testing the defendant’s DNA sample during a murder investigation without a warrant. We explained that the Supreme Court’s “recent decisions applying the exception have broadened its application, and lead us to conclude that the Fourth Amendment violations here should not result in application of the exclusionary rule.” Id. at 251.[10]
B.
As we have noted, “the good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.” Herring, 555 U.S. at 145, 129 S.Ct. 695 (citation and internal punctuation omitted). In Davis, the Supreme Court answered this question in one specific circumstance, holding that “searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule.” 131 S.Ct. at 2423-24. As the Court explained: “An officer who conducts a search in reliance on binding appellate precedent does no more than act as a reasonable officer would and should act under the circumstances. The deterrent effect of exclusion in such case can only be to discourage the officer from doing his duty.” Id. at 2429 (citations and internal punctuation omitted). Thus, if “binding appellate precedent” allowing warrantless GPS usage existed in May 2011, and if it was objectively reasonable for a reasonably well-trained officer to rely on that precedent, then Davis controls, and the exclusionary rule is inapplicable.
Despite the ample body of federal law existing in 2011 that supported warrant-less GPS usage similar to what happened in this case, Stephens contends that none of those cases was binding precedent in the Fourth Circuit and, for that reason, *337 the exclusionary rule must apply. In essence, Stephens relies on a negative implication: in his view, the Davis Court’s application of the good-faith inquiry in the specific circumstance where an officer has reasonably relied on binding appellate precedent precludes application of the good-faith inquiry in the slightly different context where an officer reasonably relied on nonbinding precedent, no matter how extensive and well-developed that precedent may be.
We have serious doubts about Stephens’ narrow view of the good-faith inquiry. Nothing in Davis itself supports such an interpretation. Instead, Davis merely establishes the inapplicability of the exclusionary rule in one specific circumstance. Davis does not, however, alter the general good-faith inquiry which, we reiterate, requires consideration of whether a reasonably well-trained officer would have known that a search was illegal in light of all of the circumstances. See generally Leon, 468 U.S. at 918 (noting that “suppression of evidence ... should be ordered only on a case-by-case basis”). Moreover, as noted, we have not previously limited the good-faith inquiry only to the precise fác-tual circumstances addressed by the Supreme Court.[11]
Stephens’ narrow interpretation of Davis presents an interesting issue, but one that is ultimately unnecessary for us to decide. As we explain below, under the facts of this case the rule announced in Davis directly controls: Officer Geare’s use of the GPS was objectively reasonable because of the binding appellate precedent of Knotts.
C.
In May 2011, before Jones, neither the Supreme Court nor this Court had expressly approved or disapproved of war-rantless GPS usage. However, in 1983, the Supreme Court held in Knotts that the use of a beeper to track a vehicle was not a search under the Fourth Amendment. In doing so, the Court explained that “[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another,” 460 U.S. at 281, 103 S.Ct. 1081, and noted that the beeper simply conveyed to the public what was evident from visual surveillance.
Knotts is not exactly on point with the facts of this case, but it is the legal princi- *338 pie of Knotts, rather than the precise factual circumstances, that matters. See South Dakota v. Opperman, 428 U.S. 364, 375, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (noting that “in all Fourth Amendment cases, we are obliged to look to all the facts and circumstances of this case in light of the principles set forth in ... prior decisions”); United States v. LaBinia, 614 F.2d 1207, 1210 (9th Cir.1980) (noting that “it is a general rule that unless the Supreme Court expressly limits its opinion to the facts before it, it is the principle which controls and not the specific facts upon which the principle was decided” (citation and internal punctuation omitted)). In this regard, we reiterate that in conjunction with the general legal landscape that existed before Jones, “Knotts was widely and reasonably understood to stand for the proposition that the Fourth Amendment simply was not implicated by electronic surveillance of public automotive movements,” Sparks, 711 F.3d at 67, and it was the “foundational Supreme Court precedent for GPS-related cases,” Cuevas-Per-ez, 640 F.3d at 273.
After Jones, we know that such an interpretation of Knotts is incorrect. Without the benefit of hindsight, however, and with no contrary guidance from the Supreme Court or this Court, we believe that a reasonably well-trained officer in this Circuit could have relied on Knotts as permitting the type of warrantless GPS usage in this case. See Aguiar, 737 F.3d at 262 (in declining to apply the exclusionary rule, the court stated that “sufficient Supreme Court precedent existed at the time the GPS device was placed for the officers here to reasonably conclude a warrant was not necessary in these circumstances”).
Our decision extends to all law enforcement officers within this Circuit as a matter of federal law, but it is bolstered in this case by the Maryland Court of Appeals’ holding in Kelly that Knotts was binding appellate precedent in Maryland under Davis and, therefore, Maryland police officers could “reasonably rely on Knotts, pr e-Jones, in affixing a GPS tracking device to the vehicle of a person under their investigation for the purpose of conducting surveillance.” Kelly, 82 A.3d at 216.[12] To be sure, Officer Geare worked on the HIDTA task force and was deputized as a federal agent, but he was also a Baltimore City police officer. In this dual role, Officer Geare was investigating both federal and state crimes, and his investigation led to Stephens’ arrest for violating Maryland law. Under these circumstances, we would make a mockery of the good-faith inquiry if we were to ignore the clear pr e-Jones state of the law in Maryland — as pronounced by Maryland’s highest court — and hold that a Maryland officer’s use of the GPS was objectively unreasonable. The fact that Stephens was later charged federally does not alter our determination.[13]
*339 IV
Based on the foregoing, we find no basis to set aside the order denying Stephens’ suppression motion. Accordingly, we affirm the conviction.

AFFIRMED

. In March 2011, Officer Geare installed the GPS on Stephens’ vehicle without a warrant, and it remained on the vehicle for several weeks. Officer Geare testified that the GPS probably had been removed because the battery was getting low.

. The record does not specify the state charges for which Stephens was arrested. We note, however, that possession of a firearm by a convicted felon is a crime under § 5-133 of the Maryland Public Safety Article.

. We upheld the constitutionality of technology-enhanced extended surveillance of public areas in United States v. Vankesteren, 553 F.3d 286 (4th Cir.), cert. denied, 556 U.S. 1269, 129 S.Ct. 2743, 174 L.Ed.2d 248 (2009), where the defendant sought to exclude evidence obtained by the government’s use of a hidden, motion-activated video camera recording his open field. We noted that the "idea of a video camera constantly recording activities on one's property is undoubtedly unsettling to some," but government agents could have personally monitored the area over a continuous period without violating the Fourth Amendment, and the fact that they "chose to use a more resource-efficient surveillance method [did] not change our Fourth Amendment analysis.” Id. at 291.

. In Karo, government agents installed a beeper inside a container and used the beeper to track the movement of the container to various locations, including a number of private residences. The Court agreed that using the beeper to monitor the movement of the container within private residences violated the Fourth Amendment. The Court distinguished Knotts because the beeper was used in that case only to locate the container as it traveled on public roads.

. Both Pineda-Moreno and Cuevas-Perez were later vacated and remanded for further consideration in light of the Supreme Court’s 2012 Jones decision. See 132 S.Ct. at 955-56 (2012).

. In August 2010, the United States Department of Justice issued an internal email opining that Maynard was "fundamentally wrong and incompatible with established Fourth Amendment principles.” See United States v. Wilford, 961 F.Supp.2d 740, 779 (D.Md.2013) (quoting the email).

.Courts also applied Knotts in cases involving similar surveillance methods. For example, in United States v. Forest, 355 F.3d 942 (6th Cir.2004), agents monitored cell phone site data to track the defendant’s movements along a public highway. The court held that the defendant "had no legitimate expectation of privacy in his movements along public highways,” and therefore the agents did not conduct a search within the meaning of the Fourth Amendment. Id. at 951.

. We decline to address the government's argument that Officer Geare’s use of the GPS was permissible under the reasonable suspicion standard because the government con *335 ceded below the illegality of the search under Jones. See J.A. 448-50.

. The good-faith inquiry is often referred to as the good-faith "exception” to the exclusionary rule. However, given the manner in which the Supreme Court has limited the application of the exclusionary rule, some commentators have questioned the accuracy of labeling the exclusionary rule as the “rule” and the good-faith inquiry as the “exception.” See, e.g., Michael D. Cicchini, An Economics Perspective on the Exclusionary Rule and Deterrence, 75 Mo. L.Rev. 459, 462 (2010) (ob *336 serving that Herring "makes the exclusionary rule a misnomer;' in fact, when exclusion is treated as a last resort, it would be far more accurate to label it the exclusionary exception rather than the rule”); Matthew A. Josephson, To Exclude or Not To Exclude: The Future of the Exclusionary Rule After Herring v. United States, 43 Creighton L.Rev. 175, 177 (2009) ("The Herring decision could transform the exclusionary rule by making the exclusion of evidence the exception rather than the rule when police violate the Fourth Amendment.”).

. In Davis, the majority stated that it was faithfully following Supreme Court precedent by applying "the rationale supporting the Court's application of the good-faith [inquiry],” and it rejected the dissenting judge's argument that it was creating a "new, freestanding exception” to the exclusionary rule. 690 F.3d at 256 n. 34.

. A simple hypothetical highlights the weakness of Stephens’ position. Returning to the days before the Supreme Court decided Jones, we assume that every other federal appellate court in the country had found warrantless GPS usage to be constitutional in published opinions, and we had done so in an unpublished opinion. Under Stephens’ position, evidence obtained by an officer in this circuit as a result of warrantless GPS usage would have to be suppressed because neither the out-of-circuit opinions nor our unpublished opinion are binding appellate precedent. To accept that view, a court would necessarily have to hold that even with this universal, but nonbinding, precedent that was directly on point, a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances.
We also note that Stephens’ view appears to run counter to the manner in which the Supreme Court has examined objective reasonableness in the analogous context of qualified immunity. See, e.g., Pearson v. Callahan, 555 U.S. 223, 244-45, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ("The officers here were entitled to rely on these cases, even though their own Federal Circuit had not yet ruled on ‘consent-once-removed’ entries.... Police officers are entitled to rely on existing lower court cases without facing personal liability for their actions.”); Wilson v. Layne, 526 U.S. 603, 617-18, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ("Given such an undeveloped state of the law, the officers in this case cannot have been expected to predict the future course of constitutional law.” (citation and internal punctuation omitted)).

. "[SJtate law is irrelevant for determining in the first instance whether fruits of a search are admissible in federal court under the Fourth Amendment, [but] state law is relevant when the analysis proceeds to the question of admitting unconstitutionally seized evidence under [the] good faith exception to the exclusionary rule.” United States v. Maholy, 1 F.3d 718, 722 (8th Cir.1993).

. Stephens contends that the HIDTA investigation was federal and that Maryland law is irrelevant. However, the facts do not establish that the investigation was exclusively federal, and our precedent regarding joint federal-state investigations undercuts Stephens’ argument. As we have explained, when "federal and state agencies cooperate and form a joint law-enforcement effort, investigating violations of both federal and state law, ... [s]uch an investigation is conducted on behalf of both sovereigns, and its object is to reveal evidence of crime — be it federal crime or state crime.” Claridy, 601 F.3d at 282. Moreover, "in the initial stages of a *339 criminal investigation, it may be anything but clear whether the conduct being investigated violates state law, federal law, or both,” United States v. Self, 132 F.3d 1039, 1043 (4th Cir. 1997), and "the decision with respect to the court in which charges are to be brought is often made by the Office of the United States Attorney and the state prosecutor, not the investigating officer,” Claridy, 601 F.3d at 282. Thus, the "possibility, even likelihood, of the federal government also bringing charges for the same underlying facts as the original state arrest does not suddenly cause state officers to stop performing their duties," United States v. Taylor, 240 F.3d 425, 428 (4th Cir.2001), and the fact that “federal officers were present, assisting in the arrest of the defendant by the state officers and that they cooperated with the state officers in the investigation that led up to the arrests has never been held in any case to render the state arrest federal,” United States v. Iaquinta, 674 F.2d 260, 268 (4th Cir. 1982) (emphasis in original).